IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| MP III HOLDINGS, INC., PETER C. MORSE, and R. BRUCE DALGLISH, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE HARTFORD CAS. INSURANCE CO., | : | NO. 08-CV-4958 |
| Defendant. | : | |

MEMORANDUM

Legrome D. Davis, J.                                                    June 30, 2011

        Plaintiffs MP III Holdings, Inc., Peter C. Morse, and R. Bruce Dalglish (together, "MP

III" or "Insureds") brought this action against their insurer, The Hartford Casualty Insurance

Company ("Hartford" or "Insurer"), under Pennsylvania's insurance bad faith statute, 42 Pa.

C.S. § 8371, based on Hartford's conduct with regard to its defense and indemnification of

underlying claims between MP III and the Pennsylvania Business Bank ("PBB" or "Bank"). The

parties have filed cross-motions for summary judgment to determine whether Hartford is liable

for bad faith. We hold that no genuine issue of material fact exists, and, because MP III has

failed to produce clear and convincing evidence from which a jury could reasonably conclude

that Hartford acted in bad faith, we grant Hartford's motion for summary judgment and deny MP

III's.

I.        FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

_____

        [1]The facts are taken from the parties' respective statements of material undisputed facts (Doc.
Nos. 69-1—MP III, 70-2—Hartford), the responses thereto (Doc. Nos. 72-2—MP III, 71-1—Hartford)
and the prior judicial decisions referenced by the parties, including Pennsylvania Business Bank v.
Franklin Career Services, LLC, et al., May Term 2002, No. 2507 (Phila. Cnty. Ct. Com. Pls. Jan. 18,
2008) (Bernstein, J.) (Def.'s Mot., Ex. 2, Doc. No. 70-7), and MP III Holdings Inc., et al. v. The Hartford,
Civ. A. No. 05-1589, 2006 WL 2645156 (E.D. Pa. 2006) (Shapiro, J.). The Court notes that MP III's
Statement of Material Facts consisted of factual statements checkered with large amounts of opinion and
conjecture. Only actual factual averments were included in this memorandum.

MP III was formerly in the business of training truck drivers. Peter C. Morse and R. Bruce Dalglish were its principal stockholders. Hartford was its insurance company. In early 2002, a financial crisis in the trucking school industry occurred when Student Finance Corporation ("SFC"), a company that securitized truck-driving student loans, collapsed due to a high rate of loan default by students of MP III and its competitors in the industry who had sold loans to SFC. In the resulting tumult, MP III was named as a principal defendant in three separate lawsuits: two in the state courts of Pennsylvania and Texas, and one in the District of Delaware bankruptcy court. MP III called on its insurer, Hartford, to defend and indemnify it in each of the three actions under the terms of an insurance policy Hartford issued to MP III the year before. It would seem that Hartford has not done very good job, however, as the present case constitutes the third time that MP III and Hartford have litigated bad faith insurance allegations related to the three 2002 lawsuits.

The first bad faith claim, brought in 2005 along with an underlying coverage dispute, was settled by the parties in March of 2007. MP III brought a second bad faith claim in 2008 in this court. Upon Hartford's prior request, Judge Mark Bernstein of the Pennsylvania Court of Common Pleas ruled in February, 2010 that the claim was precluded by the agreement that settled the first claim. At the core of this third claim, also filed with us in 2008, and amended in 2010, are MP III's allegations that Hartford acted in bad faith when it (1) allegedly terminated the defense of MP III against underlying claims brought in 2002 by PBB, and sought declaratory judgment in Pennsylvania state court that it did not have a duty to defend MP III against those claims, (2) "threatened" to terminate the defense if MP III did not assert a certain position in arbitration between MP III and PBB that MP III considered frivolous, (3) "intentionally misrepresented" its position by telling MP III that it was not necessarily terminating coverage, when it actually was. (Pl.'s Br. Supp. Mot. Summ. J., Doc. No. 69-2 at 1 & 26.)

While this constitutes the gist of the present claim, the relevant backdrop is a complex

and contentious factual mosaic, covering almost a decade of litigation in a half-dozen courts. Because MP III asserts that a range of Hartford's conduct was in bad faith, and because the perceived rights and obligations of the parties hinge on the interplay between a plethora of factors spanning a significant time period, we describe the vast picture in its entirety, below.

A.   The Underlying PBB Action and the PBB-MP III Agreement

In 2002, MP III was sued three times.  First, The Royal Indemnity Company ("Royal") sued MP III in state court in Texas ("Texas Action" or "Royal Action").  MP III and its competitors had sold student loans to SFC, who securitized them.  Royal insured payment to the security holders in the event of default by the student borrowers.  In Royal Indemnity Company v. MP III Holdings, Inc. et al, Case No. D 1673 70 (Dist. Ct. Jefferson Cnty., 58th Judicial Dist.), Royal sued MP III and other truck driving schools for engaging in an alleged fraudulent ponzi scheme with SFC in connection with the tuition loans which Royal claimed induced it to provide the insurance.  Faced with these claims, MP III called upon its insurer, Hartford, to defend and indemnify it under the terms of a previously-issued Educator's Legal Liability Policy.

Also in 2002, in Stanziale v. MP III Holdings, Inc. et al., Adversary Proceeding No. 04-56408 (Bankr. D. Del. 2002) ("Delaware Action" or "Stanziale Action"), SFC's bankruptcy trustee filed suit against MP III to recover $32 million that SFC had transferred to MP III as a result of the alleged tuition loan fraud at issue in the Royal Action.  Again, MP III sought defense and indemnity from Hartford.

Although the parties' activities related to these two lawsuits are relevant to the present bad faith claim, the underlying piece of litigation primarily at issue in the instant dispute involves the third 2002 action— PBB's suit against MP III in the Pennsylvania Court of Common Pleas for Philadelphia County ( "PBB Action").  Around the same time that SFC collapsed, Morse and Dalglish sold all their MP III stock to a competitor, Franklin Career ("Franklin"), which took control of MP III's operations.  Franklin guaranteed it would repay a $1.5 million loan PBB had

made to MP III but it failed to so. PBB brought suit against MP III, Franklin, Morse and Dalglish in connection with the loan default and the MP III – Franklin merger, which PBB contended was designed to defraud it.

In response to the claims asserted by PBB, MP III asserted cross claims against third-party defendants, Leeds Weld, alleging that Leeds Weld had interfered with the merger contract between MP III and Franklin. Morse and Dalglish also asserted counterclaims individually against PBB. As was the case in Texas and Delaware, MP III sought defense and indemnity from the Hartford in this action.

On October 13, 2006, shortly before trial in front of Judge Bernstein, the two primary parties, PBB and MP III, executed a "Settlement Agreement and General Release" (the "PBB Agreement") in which they expressly agreed to dismiss PBB's claims from court. (Def.'s Mot., Ex. 4, Doc. No. 70-13.) MP III's third party claims against Leeds Weld were to remain in front of Judge Bernstein. Because the present parties dispute the effect of this Agreement on Hartford's coverage obligations, it is worth discussing and quoting in detail.

The Agreement begins with several "whereas" clauses that frame the Agreement, including clauses setting out (1) the nature and parties in the underlying lawsuit,[2] (PBB Agreement, Def.'s Mot., Ex. 4, Doc. No. 70-13), (2) the parties' intentions to dismiss the claims with prejudice and resolve them through mediation and, if necessary, arbitration,[3] (id. at 1), (3) that PBB's claims are set forth in the Fourth Amended Complaint in the PBB Action and MP

---

[2] "WHEREAS, PBB has pressed legal claims against Morse, Dalglish, and MP III in the lawsuit captioned *Pennsylvania Business Bank v. Franklin Career Services, LLC et al.*, Philadelphia Court of Common Pleas, May Term 2002, No. 2507 (the "Lawsuit") and Morse and Dalglish have pressed a counterclaim against PBB in the Lawsuit;")

[3] "WHEREAS, PBB, Morse, Dalglish and MP III now wish to resolve PBB's claims and Morse and Dalglish's counterclaim through mediation and, if necessary, binding arbitration and wish to dismiss the claims and counterclaims with prejudice;
WHEREAS , PBB, Morse, Dalglish and MP III do not seek to raise any new claims or counterclaims at mediation or at arbitration;"

III's in the Counterclaim,[4] (id.), and (4) that the parties have completed discovery.[5] (Id.)

The Agreement then contains fourteen paragraphs detailing the terms of the settlement. PBB agreed to "dismiss without prejudice and without costs PBB's lawsuit (namely claims) against Morse, Dalglish and MP III in its entirety."[6] (Id. at ¶ 1.) Morse and Dalglish agreed to the same regarding their counterclaim. (Id. at ¶ 2.) The parties agreed to submit their claims and defenses to mediation, which could occur only after MP III's claims against Leeds Weld had been resolved.[7] (Id. at ¶ 3.) If mediation did not resolve the issues between PBB and MP III, the Agreement states that the claims were to be submitted to binding arbitration.[8] (Id. at ¶ 4.) The Agreement states that it "represents the settlement of disputed claims and a counterclaim," and is not admission of guilt.[9] (Id. at ¶ 6.) Importantly, the Agreement contains a covenant regarding distribution of any proceeds MP III receives from the Leeds Weld defendants on its claims that remained in front of Judge Bernstein.[10] (Id. at 7.) Those proceeds were to be "deposited into an

---

[4] "WHEREAS, PBB's pending claims against Morse, Dalglish, and MP III and Morse and Dalglish's pending counterclaim against PBB are respectively set forth in full in PBB's Fourth Amended Complaint . . . ."

[5] "WHEREAS, PBB, Morse, Dalglish and MP III and all other parties to the Lawsuit have conducted and completed all discovery in the Lawsuit."

[6] "Dismissal of Lawsuit by PBB. In consideration of the promises called for herein, PBB shall within seven (7) days . . . dismiss with prejudice and without costs PBB's claims . . . ."

[7] "Mediation. Absent earlier resolution of PBB's claims and Morse and Dalglish's counterclaim, after the close of trial of the Lawsuit, but not before, PBB, Morse, Dalglish and MP III shall submit their claims and defenses to a mediator for mediation."

[8] "Failure to Resolve Dispute through Mediation. If mediation does not resolve the disputes, the parties shall submit PBB's claim and Morse and Dalglish's counterclaim and defenses thereto to binding arbitration . . . ."

[9] "Denial and Compromise. PBB, Morse, Dalglish, and MP III represent, acknowledge, and agree that this Agreement effects the compromise and settlement of claims, a counterclaim, and demands that are disputed . . . . This Agreement represents the settlement of disputed claims and a counterclaim and is not an admission of fault or liability as to those claims or counterclaims.")

[10] "Standstill Pending Mediation and Arbitration. PBB, Morse, Dalglish and MP III, represent, acknowledge, and agree that the entire amount of any award or settlement obtained by any party to this

escrow account" and "disbursed either by agreement of the parties or in accordance with or consistent with an Order or award from the Arbitration conducted pursuant to this Agreement." (Id.)  Next, in the "Mutual Release" clause, the parties state that they "completely release, acquit, and forever discharge one another . . . from any and all claims that in any way relate to, arise out of, or are or could have been asserted in the Lawsuit . . . ."[11] (Id. at ¶ 8.)  Finally, the Agreement contains various provisions regarding governing law, authorization, entire agreement, and the like.

Within two weeks of the execution of this Agreement, on October 25, 2006, Judge Bernstein docketed the matter as "settled discontinued and ended" as to Defendants MP III, Morse and Dalglish.  (State Court Action Docket, Def.'s Mot., Ex. 5, Doc. No. 70-14.)  The third party claims by MP III against the Leeds Weld Defendants remained active.

After the Agreement was entered into on October 13, 2006, counsel for MP III, Alan Cotler of the law firm Reed Smith, sent the Agreement to John Grugan of the law firm Ballard Spahr, who was then counsel for MP III's insurer, Hartford.  The facsimile cover sheet stated that the Agreement "sever[ed] those claims out of the . . . case and put[] them into mediation or

---

Lawsuit from this day forward from any of the defendants in the Lawsuit (hereinafter referred to as the "Lawsuit Proceeds") shall be deposited into an escrow account . . . .  The Lawsuit Proceeds shall be disbursed either by agreement of the parties or in accordance with or consistent with an Order or award from the Arbitration conducted pursuant to this Agreement.  The parties agree that in any arbitration to decide the rights in the Lawsuit Proceeds, any designation, allocation or determination by any jury or judge that the award or settlement is attributable or payable to any one or more of Morse, Dalglish, and/or MP III shall not be binding on the arbitrator.  The arbitrator shall make an independent determination of the rights of all parties, i.e., Morse, Dalglish, MP III and PBB, therein based on the appropriate law and all of the relevant facts."

[11]"Mutual Release.  Subject to the terms of the Agreement, PBB, on the one hand, and Morse, Dalglish, and MP III, on the other hand, completely release, acquit, and forever discharge one another . . . from any and all claims that in any way relate to, arise out of, or are or could have been asserted in the Lawsuit, including without limitation, any and all claims . . . [the parties] may now have, or ever had, against each other through and including the date hereof, or that relate to or arise out of the Lawsuit.  Without limitations to the foregoing, [the parties] . . . further covenant and agree that they shall not assert any claims in the future against each other . . . for any claims alleged in the Lawsuit . . . ."

arbitration. The . . . case will continue with respect to Dalglish's and Morse's claims against Leeds Weld." (Pl.'s Mot. Ex. I, Doc. No. 69-10.) Grugan, along with Warren Freiman—Hartford's Claims Manager for PBB's claims against MP III, and Naomi Kinderman—Hartford's in-house lawyer, all testified that they reviewed the agreement. (Grugan Dep. at 86 & 91, Pl.'s Mot, Ex. G, Doc. No. 69-10; Freiman Dep. at 97-100, Pl.'s Mot., Ex. C., Doc. No. 69-9; Kinderman Dep. at 144-144, Pl.'s Mot., Ex. I, Doc. No. 69-10.) None of these individuals opined at that time of the agreement on its effect on Hartford's defense of MP III. Internal communications at Hartford and reinsurance reports throughout 2007 show an awareness that the PBB Action was severed from court, with Freiman stating by email that the case "has by stipulation been referred to arbitration." (Pl's Mot., Ex. M, Doc. No 69-11.)

In January of 2008, sixteen months after the PBB Agreement, Judge Bernstein issued an opinion ruling against MP III on its remaining third party claims against Leeds Weld. (Def.'s Mot. Ex. 2, Doc. No. 70-7.) Judge Bernstein noted in his opinion that, at oral argument, MP III had "conceded that they had no valid claim against the majority of the defendants whom they had named and against whom they had prosecuted their claims for over four years. . . . [MP III] admitted that several of [the defendants] do not exist and that no evidence had been offered to show that the others had anything to do with either Franklin or the proposed merger."[12] (Id.)

Soon after Judge Bernstein handed down his decision, MP III informed its insurer, Hartford, that it was planning to appeal. In a letter of February 21, 2008, Hartford, by way of new outside counsel Ronald Schiller, then of the law firm DLA Piper, expressed its opinion that it had a lack of a contractual obligation with respect to the funding of the appeal of those affirmative claims, and further expressed its opinion that the October 2006 Agreement between

---

[12] The Leeds Weld Defendants subsequently brought a claim against Cotler, Reed Smith, Morse, and Dalglish, under the Dragonetti Act, alleging wrongful use of civil proceedings and abuse of process based on MP III's claims. See Complaint, Jeffrey Leeds, et al v. Cotler, et al., No. 08-5236 (E.D. Pa.) Filed Nov. 3, 2008), Def.'s Mot, Ex. 7, Doc. No. 70-16.

PBB and MP III released PBB's claims, therefore, there was nothing left to defend in the PBB Action ("Schiller's February 21st Letter," Pl.'s Mot., Ex. 10, Doc. No. 69-4.) Hartford brought a subsequent declaratory judgment action in the Philadelphia Court of Common Pleas in this regard.[13]

On appeal of Judge Bernstein's decision against MP III on the Leeds Weld claims, the Pennsylvania Superior Court affirmed the directed verdict, noting that MP III had "blatantly misrepresent[ed]" witness testimony. Pennsylvania Business Bank v. Franklin Career Services, LLC, et al., No. 1481 EDA 2007 at 16 (Pa. Super. Ct., Mar. 27, 2009) (Def.'s Mot, Ex. 6, Doc. No. 70-15). The Pennsylvania Supreme Court denied MP III's petition for appeal.

B.      Prior MP III – Hartford Coverage Dispute and Settlement Agreement

In 2005, prior to the PBB Agreement, during the pendency of the three actions against MP III, MP III sued Hartford in Pennsylvania state court alleging that Hartford breached its duty to defend it in the PBB Action and the two other cases that were proceeding concurrently in Texas and Delaware. The suit, which sought coverage under the insurance policies and damages for bad faith conduct, was removed to the U.S. District for the Eastern District of Pennsylvania.

Hartford filed a motion to dismiss the Count of that complaint alleging it had breached the duty to defend MP III in the Texas case, and MP III cross moved for summary judgment on the same Count. Judge Norma Shapiro, in an opinion dated September 14, 2006, held that Hartford had a duty to defend MP III as long as the negligent misrepresentation count remained in the underlying Texas action. MP III Holdings Inc. et al., v. The Hartford, Civ. A. No. 05-1589, 2006 WL 2645156 (E.D. Pa. 2006). Six months later, on March 19, 2007, the parties settled the remaining aspects of the dispute by executing a "Confidential Settlement Agreement and Mutual General Release." ( "Hartford Release," Pl.'s Mot., Ex. 64, Doc. No. 69-6.) In this

_____

[13]Hartford's February 21st letter and the declaratory judgment action are at the heart of the present bad faith action, and are both discussed at length, below.

Agreement and the incorporated recitals, Hartford agreed to pay $4.8 million to settle outstanding fees and bad faith claims relating to the underlying suits, and pay certain hourly rates for any ongoing defense costs in the Texas and PBB actions under a reservation of rights. (Def.'s Mot, Ex. 9, Doc. No. 70-18.) The Hartford Release and associated recitals state that the Texas and PBB actions are "ongoing and have not been concluded." This release between MP III and Hartford was executed five months after the agreement between MP III and PBB settling their lawsuit and agreeing to mediate/arbitrate.

### C.     The February 21st and March 4th Schiller Letters

In mid-2007, following the settlement of the first bad faith action in Texas, Hartford retained Schiller to represent Hartford's interest as insurer of MP III in the underlying claims in the Texas action. Im early 2008, shortly after Judge Bernstein decided against MP III in its affirmative claims against Leeds Weld, additional disputes arose between MP III and Hartford related to the PBB Action in Pennsylvania. On February 21, 2008, Schiller sent a letter to counsel for MP III, which he characterizes in his Response to MP III's Request for Written Interrogatories as aiming to:

> [C]larify whether the MP III Defendants intend to seek further reimbursement for any fees or costs, incurred in the appeal of the Leeds Weld Claims or the defense of any future PBB claims since none existed at the time but MP III was still demanding payment . . . [and to state] Hartford's legal conclusion that the PBB "Settlement and General Release Agreement" released all claims and counterclaims between PBB and the MP III Defendants, except for any mediation and/or arbitration that would occur to divvy up the spoils if, but only if, the MP III Defendants prevailed in their affirmative claims against the Leeds Weld Defendants. The MP III Defendants did not prevail in those affirmative claims and, absent reversal on appeal, The Hartford concluded there was no likely claim left to defend under the PBB "Settlement and General Release Agreement."

(Pl.'s Mot., Ex. P, Doc. No. 69-11.)

Because MP III places significant weight on this letter in its allegations of bad faith, it is worth summarizing and quoting its contents in detail. Schiller begins the letter, which is addressed to MP III counsel Cotler, by stating that, the day before, Hartford had forwarded to

Schiller two documents—(1) Judge Bernstein's decision in the PBB Action ruling against MP III's affirmative claims against Leeds Weld, and (2) the October 13, 2006 settlement agreement between PBB and MP III. He states that this was the first time he had seen either document though he understood that MP III "may have discussed the PBB settlement agreement with [Hartford's previous outside counsel,] Ballard Spahr." (February 21st Letter, Pl.'s Mot., Ex. 10, Doc. No. 69-4.) Schiller states that he and Hartford were "surprised" when they received the PBB settlement agreement, especially in the context of the Hartford-MP III settlement agreement discussion and negotiations. (Id.) "As recently as last week," the letter states, "MP III failed to expressly inform Mr. Freiman that PBB's claims had been released, while . . . providing him a lengthy discourse of the status of [MP III's] affirmative claims against the Leeds[] Weld entities." (Id.) Schiller states that, "MP III knew that Hartford never had a contractual obligation with respect to those claims, and as of the date of the PBB/MP III release, no obligation to defend MP III against the PBB claims." (Id.)

The letter then outlines Schiller's interpretation that the settlement agreement between PBB and MP III, according to its terms, was "entered into to resolve, dismiss and release all 'claims' and 'counterclaims' between PBB and MP III." (Id.) Paragraph 7 of that settlement agreement, according to Schiller, provided for subsequent mediation and/or arbitration "solely to decide the rights of PBB and MP III in the event that any 'Lawsuit Proceeds' resulted from [MP III's affirmative claims against Leeds Weld]." (Id.) Therefore, after the date of the PBB Agreement, "there were no claims left from PBB to defend." (Id.) Mediation or arbitration would occur "only to divvy up the spoils" if MP III recovered something as third party plaintiff in its claims against Leeds Weld. (Id.)

The letter then states that, "[u]nder the circumstances, [Schiller] cannot imagine that MP III would contend it has the right to reimbursement of costs, expenses, fees or any other sums from Hartford after October 13, 2006, in connection with the PBB lawsuit." (Id.) Schiller states

that he is "looking into whether MP III has submitted any requests for payment of legal fees and/or costs regarding services performed after the effective date of the PBB release," and that "Hartford does not agree that MP III is entitled to any payments in connection with the 'defense' or 'indemnity' with respect to the PBB lawsuit after October 13, 2006." (Id.)

The letter concludes with Schiller's request for Cotler to "please confirm that MP III does not intend to seek payment for any such fees or costs with respect to the PBB lawsuit now or in the future," and a statement that, "given the settlement in [Delaware], what could possibly be left other than miscellaneous [Texas] lawsuit-related bills?" (Id.)

Cotler, on behalf of MP III, responded to the February 21st Letter by voicemail on February 25, 2008, and by separate letters on February 28 and March 3, 2008. In his voicemail, Cotler states:

> I'm back in the office and I have looked at the agreement. You guys in your [2007] settlement agreement with us agreed to defend the Bank's claims against us even after you had in your possession the agreement with Pennsylvania Business Bank. So, that's an important fact that would probably be a problem for you guys. Moreover, I just got back and I am looking over the [PBB Agreement] again and I think there is a very good argument that the underlying claims still exist and that what [PBB] was agreeing to was only that the damages would be limited to what we got from Leeds Weld. In fact, in the Whereas clause it talks about how [PBB] would bring [its] claims in arbitration and mediation first and that's why they are set forth in the Whereas clause. More importantly, you guys agreed to defend those very claims even after the agreement with [PBB] was given to [former Hartford Counsel,] Grugan.

(Cotler Voicemail, Pl.'s Mot., Ex. 64, Doc. No. 69-14.)

Three days later, in a February 28th letter, Cotler states that "the agreement with the Bank never specifically provides that the Bank's damages and recoveries are limited to 'Leeds Weld monies'. . . . A fair reading of the agreement may be that the Bank only agreed to transfer all of its claims against MP III, Morse and Dalglish, for which there is insurance coverage, from the trial court to arbitration." (Cotler Feb. 28 Letter, Pl.'s Mot., Ex. 86, Doc. No. 69-7.) Furthermore, "there is nothing in that agreement that specifically precludes the Bank from getting

monies beyond the 'Leeds Weld proceeds' should the Bank prevail on its claims for which there is insurance coverage." (Id.)

Cotler followed up this letter with another one sent three days later on March 3, 2008, in which he informed Schiller that MP III is appealing Judge Bernstein's verdict against its affirmative claims against Leeds Weld. (Pl.'s Mot., Ex. 11, Doc. No. 69-4.) The letter continued by stating that, in arbitration, PBB "may argue" that the PBB Agreement does not preclude it from seeking monetary damages beyond the amount of the Leeds Weld proceeds. (Id.) The letter next states that it "confirms that . . . if Pennsylvania Business Bank pursues any of its claims in arbitration or otherwise against your insureds, the very claims that Hartford concedes that it must defend and indemnify, we will expect the Hartford to pay for that defense and for any settlement or verdict or judgment." (Id.) The letter goes on to state that the agreement between MP III and the Bank "does not extinguish Hartford's legal obligation to not only defend against the Bank's claims in arbitration or other venue, but it also does not extinguish the Hartford's legal obligation to pay any amount paid to the Bank in settlement or verdict." (Id.) Cotler then notes that MP III was not told of a $10 million umbrella policy until after MP III's agreement with the Bank, and concludes by stating that Hartford "expressly agreed to defend and cover the Bank's claims in a written contract even after we gave the Agreement with the Bank to counsel for the Hartford." (Id.)

The next day, March 4, 2008, Schiller responded by letter to Cotler. ("March 4th Letter," Pl.'s Mot., Ex. 12, Doc. No. 69-4.) Schiller's letter reiterated Hartford's position that MP III's appeal of Judge Bernstein's verdict against it on its affirmative claims against Leeds Weld "does not in any manner implicate The Hartford's coverage to MP III and, accordingly, The Hartford is not responsible for paying for that appeal." (Id.) Turning to MP III's argument that the Hartford had a duty to defend it against PBB, Schiller states that, "[i]n the event the PBB brings a claim or attempts to resuscitate the released claim against MP III, The Hartford will review the claim

properly in accordance with the policies of Pennsylvania law. If a duty of defense is owed, a defense will be provided. If such a hypothetical claim ultimately results in damages covered under the policy, the Hartford will cover those damages." (Id.) Schiller continues by stating, "The Hartford does not agree that it is in any manner bound to defend or indemnify MP III for such a hypothetical claim when it is not being pursued now and, we believe, it could not be pursued. The Hartford will, however, of course review any such claim that you should forward." (Id.)

Schiller then states in this March 4th Letter that he is "troubled" to the extent that Cotler's letter "continues to make the argument in PBB's favor that PBB should or could have a claim against MP III when [he] believe[s] a fair reading of the PBB settlement agreement under Pennsylvania law compels the conclusion that PBB released all claims." (Id.) The only reasonable way to construe the Whereas clauses preceding the release language in the PBB agreement, Schiller states, is to interpret it as representing that "PBB and MP III were reserving their rights to arbitrate as to the 'Lawsuit Proceeds' alone." (Id.) "More important," Schiller states, "it is clearly MP III's obligation to enforce – and argue for the enforcement of – the PBB settlement agreement in the way that maximizes protection to MP III." (Id.)

### D. Hartford's Reinsurance Report

Approximately seven weeks after the March 4th letter, on April 24, 2008, Hartford filed a reinsurance report updating its own insurer as to the status of the PBB matter. The report, which MP III obtained during later discovery, states:

> We have now had the opportunity to review the settlement agreement that PBB and [MP III] entered into resulting in the dismissal of the PBB lawsuit. The settlement agreement releases all claims that PBB had against [MP III], except to the extent that [MP III] may recover damages from a third party. In that event, PBB may make a claim against [MP III] for allocation of such recovery.

(Pl.'s Mot., Ex. S, Doc. No. 69-14.)

The report goes on to state:

> The effect of the release is that there is no longer a viable damages claim against [PBB] asserted by MP III which falls within the scope of the coverage issued. We have communicated to [MP III] our position that not only does Hartford have no duty to pay for any amounts that [MP III] may owe to PBB by virtue of the release terms, but that Hartford has no duty to defend the existing claim if it is pursued. The release was effective October 20, 2006 and therefore our duty to defend ended as of the release date.

(Id.)

The report states finally that Hartford has "placed this file into inactive mode as we believe Hartford's contractual obligations have been eliminated by the parties' release. It is possible that [MP III] will take issue with Hartford's position, but we are confident that our conclusion is correct." (Id.)

E.    The Reed Smith Invoices

Two weeks after the initial flurry of letters back and forth between Schiller and Cotler, on March 18, 2008, Reed Smith invoiced Hartford for professional services related to MP III's defense. Later, on May 23, 2008, in response to an email request, Cotler sent a letter to Warren Freiman, outlining four entries on that invoice which were "expressly and completely devoted to issues in representing your insured, MP III, against claims made and still being made by the Pennsylvania Business Bank." (Pl.'s Mot., Ex. BB, Doc. No. 69-16.) The entries identified by Cotler all fall within January 22 and February 26, 2008, during the period after the agreement severing the claims from court, but before mediation had been demanded by PBB. (Id.) Cotler's letter states, "[PBB's] claims have not been extinguished. Rather, in a best case scenario, Pennsylvania Business Bank still possesses those claims but its damages have a ceiling of any monies that MP III receives [from Leeds Weld]." (Id.) Cotler then turns his attention to MP III's affirmative claims against Leeds Weld and concludes his letter by stating that "Hartford is again breaching its insurance contract incurring bad faith liability by not paying for [MP III's] appeal of

the Leeds Weld case and its prosecution . . . . " (Id.)

MP III asserts that Hartford did not pay this invoice. It provides two pieces of evidence to support this assertion: (1) the October 25, 2010 Declaration of MP III's own attorney, Cotler, where he states that Reed Smith's accounting records indicate the invoice was not paid, (Pl.'s Mot., Ex. CC, Doc. No. 69-16), and (2) MP III's Amended Responses to Hartford's Requests for Admission from the Pennsylvania state court declaratory judgment action, discussed below, where MP III denies Hartford's request to admit that the invoices were paid. (Pl.'s Mot., Ex. Z, Doc. No. 69-15.) In response, Hartford denies MP III's averment that Hartford failed to reimburse the invoice and points to seven different places where MP III represented to the state court, this Court, and the Third Circuit, that Hartford paid all defense and indemnity expenses related to PBB's claims. (Def.'s Resp. Opp'n Pl.'s Purported Statement Undisputed Facts, Doc. No. 71-1 at 15.)

Although the parties dispute this issue, as we explain in our Discussion, below, this factual dissidence does not preclude summary judgment.

> F.      The Declaratory Judgment Actions

On June 11, 2008, Hartford filed a complaint for declaratory judgment in the Court of Common Pleas of Philadelphia County, seeking "a declaration of non-coverage from this Court in connection with the MP III Defendant's improper demand for the payment of legal fees and costs incurred in their affirmative pursuit of damages against third parties in underlying litigation originally brought by the Pennsylvania Business Bank." (Def.s' Mot., Ex. 12, Doc. No. 70-21 at ¶1.) The Background section of that complaint described the March 2007 settlement agreement entered into between Hartford and MP III on the coverage and bad faith dispute, outlined the nature of the underlying lawsuit between MP III and PBB, detailed the 2006 agreement between MP III and PBB, and discussed the dispute regarding Hartford's defense obligations in the underlying PBB Action in light of that agreement. (Id.) The sole count of that Complaint

requested that the Court:

> A.    Determine, decide, adjudicate and declare the rights and liabilities of the parties hereto with respect to the Hartford Policies;

> B.    Determine, decide, adjudicate and declare that there is no duty to pay defense or costs under the Hartford policies for any legal fees or costs incurred by MP III, Morse, or Dalglish in appealing or otherwise prosecuting their claims for damages against the Leeds Defendants in the PBB Action;

> C.    Award The Hartford all costs and expenses incurred in this matter, and grant any such other and further relief which this Court deems just and proper.

(Id. at 13.)

Soon thereafter, Hartford learned that MP III was planning to file a bad faith claim for damages in federal court on the ground that Hartford supposedly concealed the existence of the $10 million umbrella policy it had issued to MP III. In response, on October 16, 2008, Hartford filed a second declaratory judgment action in the Philadelphia County Court of Common Pleas. This complaint incorporated the allegations in the June complaint, and sought declaratory relief that the 2007 agreement between the Hartford and MP III settling their prior bad faith and coverage dispute barred MP III's anticipated claim that Hartford concealed the existence of the umbrella policy. Additionally, Hartford states in the complaint that it:

> [S]eeks a declaration to enforce PBB's settlement and release with MP III Defendants which would, as stated in the [June declaratory judgment complaint], remove any and all defense obligations potentially owed by The Hartford under its insurance policies. The Hartford also seeks a declaration from [the Court of Common Pleas] that it does not owe the fees and costs demanded by the MP III Defendants in the PBB Action.

(Def.'s Mot., Ex. 14, Doc. No. 70-23.)

Less than two months later, on December 4, 2008, Hartford amended its complaint in the first declaratory judgment action, broadening its scope to "essentially bring[] the first action in line with the second." (Def.'s Resp., Ex. 51, Doc. No. 71-5.) The Prayer for Relief in the

16

amended complaint adds to the initial three requests Hartford's request that the court "Determine, decide, adjudicate and declare that the release executed by the MP III Defendants bars their claims." (Id.)

On December 5, 2008, the state court consolidated Hartford's first (as amended) and second declaratory judgment actions.

G.      MP III's Concurrent Claim in this Court

The day after Hartford filed its second complaint, but prior to its filing of the amended complaint, on October 17, 2008, MP III filed the present action in this Court. MP III alleged broad bad faith claims regarding Hartford's alleged concealment of the umbrella policy, (Doc. No. 1 at ¶41(a)-(f)), Hartford's "wrongful[] attempt[] to use the terms of the Settlement Agreement between Plaintiffs and PBB to avoid the obligation to defend and indemnify Plaintiffs . . .," (id. at (g)), and Hartford's forcing of Plaintiffs to incur the expense of defending the declaratory judgment actions in state court. (Id. at (h).) Hartford filed a motion to stay MP III's federal action pending the resolution of the state court declaratory judgment action. We granted Hartford's motion, relying on a "general policy of restraint when the same issues are pending in state court." (Doc. No. 21.) Hartford appealed our Order to the Third Circuit, but eventually withdrew its appeal.

H.      Judge Bernstein's Decision in Hartford's Declaratory Judgment Action

On March 6, 2009, Judge Bernstein ruled on MP III's preliminary objections to the Hartford's declaratory judgment action. In his order, Judge Bernstein characterized Hartford's action as requesting three separate declarations:

1.    That the Hartford policies do not cover any legal fees and costs incurred by the MP III Defendants in appealing [the common pleas court's] directed verdict in the PBB Action;

2.    That the Settlement and General Release Agreement executed in the PBB Action eliminated any remaining defense obligations owed by plaintiff under the Hartford Policies to the MP III Defendants with respect to PBB's claims;

3. That the MP III Defendants are barred, under the release terms of the Settlement Agreement executed in the Coverage Action, from prosecuting the Bad Faith Action.

(Hartford Cas. Ins. Co., v. MP III Holdings Inc. et al., No. 01948, June Term 2006 (Mar. 6, 2009 Phila. Cnty. Ct. Com. Pls.),  Pl.'s Mot., Ex. 3, Doc. No. 69-3.)

Upon consideration of MP III's preliminary objections to Hartford's action, Judge Bernstein held that the facts relating to the first request for judgment were not in dispute and that MP III admitted in its objections that the Hartford Policies do not cover any legal fees and costs incurred by the MP III in appealing the common pleas court's directed verdict on its affirmative claims against the Leeds Weld defendants. (Id. at 3)  Therefore, "[Hartford] has no duty to pay any legal fees and costs incurred by MP III . . . in appealing this court's directed verdict."  (Id. at ¶ 1.)  On the second request, Judge Bernstein's opinion explains that the request hinges on the "interpretation of unambiguous language" of the PBB Agreement.  (Id. at 3.)  "As a matter of law," the opinion states, "the terms of the [PBB Agreement] do not eliminate the defense obligations owed by plaintiff, under the Hartford Policies, with respect to PBB's remaining claims against the MP III Defendants."  (Id.)  Judge Bernstein held that he could not rule on Hartford's third request, because he did not have the 2007 Agreement from the MP III-Hartford coverage action before him.

On September 15, 2009, after the close of discovery, Hartford moved for summary judgment in their declaratory judgment action on the basis that (1) the 2007 Release between Hartford and MP III barred MP III's claim that Hartford's allegedly concealed the umbrella policy in bad faith, (2) any correspondence from Hartford to MP III in early 2008 questioning Hartford's duty to defend claims that MP III had not yet asserted could not constitute bad faith as a matter of law where Hartford communicated that it would consider coverage for any claim if it was raised; and (3) the lack of any harm associated with MP III's bad faith allegations would

preclude recovery under the bad faith statute.

On February 19, 2010, Judge Bernstein granted Hartford's motion on the first basis—finding that the 2007 Release barred MP III's bad faith claim as to the alleged concealment of the umbrella policy—but he declined to rule on the other aspects of the motion, stating that Hartford had not initially requested a declaration in this regard.

I.      Letters Leading up to the PBB – MP III Mediation

On April 6, 2009, after Judge Bernstein had ruled that the PBB Agreement did not eliminate the defense obligations owed by Hartford with respect to PBB's remaining claims, but prior to his summary judgment order denying MP III's bad faith claim regarding the umbrella policy, PBB demanded mediation of its claim against MP III.  Cotler forwarded PBB's demand letter to Schiller with a cover letter stating that "[the] case can and should be settled within the umbrella and policy limits now."  (Def.'s Mot., Ex. 12, Doc. No. 70-21.)  The cover letter also stated, "[a]s you know, we are already asserting bad faith claims against Hartford for, inter alia, its baseless refusal to defend its insureds against the Bank's claims."  (Id.)

Schiller responded by letter on April 16, 2009.  Schiller's letter states that "Hartford has agreed to provide a defense to MP III in connections with PBB's claim just submitted April 6, 2009, subject to a reservation of rights." (Def.'s Mot., Ex. 40, Doc. No. 70-50.)   Schiller also remarks that Cotler "misstate[s] once again that The Hartford has refused to defend its insureds against the PBB's claims."  (Id.)  The letter goes on:

> We are at a loss to understand why you keep repeating this misstatement.  Until last week, there were no claims by PBB to defend.  Further, The Hartford has repeatedly confirmed that in the event that PBB pursued a claim implicating the policies, The Hartford would review the claim and, if appropriate, provide a defense.  My letter of last week addressed that.  My letter of March 2008 addressed that. Prior correspondence from the Hartford addressed that.

(Id.)  Schiller's letter then requests that Cotler "please confirm that you intend to assert the defense of the release entered into between PBB and MP III to PBB's claims in any mediation

and arbitration. Also, when do you plan to assert this defense?" (Id.)

Four days later, Hartford case manager Walter Freiman wrote to Cotler, informing him of the terms and conditions under which Hartford would provide a defense to MP III with respect to PBB's April 6, 2009 mediation demand. In the letter, Freiman states that the Hartford reserves its rights to assert a conflict of interest in Reed Smith's continued representation of MP III arising out of the agreement between PBB and MP III and the drafting and negotiations of the settlement documents. The letter also states that the Hartford reserves the rights to refuse to pay sums based on liabilities arising out of the terms of a loan contract, "if the effect of such payment would be the unjust enrichment of the insured," which is against the public policy of Pennsylvania and mirrored in exclusion 2f of the policy. (Pl.'s Mot., Ex. 91, Doc. No. 69-7.) "Furthermore," the letter states, "the evidence available to us indicates that the amount borrowed by the insured from PBB may have been part of an alleged scheme to defraud PBB," for which damages may not be paid by an insurer under Pennsylvania law. (Id.)

Cotler, on behalf or MP III, responded to Schiller and Freiman's letters on May 4, 2009. Cotler states that Hartford's "demand," "insistence," and "continued efforts to force" MP III to assert a "factually and legally baseless 'release' defense," and Hartford's "threat that the MP III/PBB agreement creates a 'conflict of interest,'" constitute bad faith and violate the Pennsylvania Rules of Professional Conduct. (Pl.'s Mot., Ex. 92, Doc. No. 69-7.) Cotler sets out the various Rules of Professional Conduct, including Rule 3.3 which prohibits a lawyer from knowingly making a false statement or offering false evidence to a tribunal, and 8.3(a), which Cotler states, "obligates lawyers to report a violation of the Rules of Professional Conduct to the disciplinary board." (Id.) Cotler then included the following bold-font demand:

> **Provide me with a confirmation in writing within ten (10) days of the date of this letter that you and Hartford will no longer demand [MP III] to testify falsely and assert in legal proceedings with PBB the factually and legally baseless defense that they and the Bank contractually agreed to a release of PBB's claims against Hartford's Insureds.**

(Id., emphasis in original.)

The letter then explained that MP III and PBB did not intend to release their claims, but to move them to mediation and/or arbitration "and to fix the claims to be mediated or arbitrated to those in the parties' operative pleadings in the PBB Action." (Id.) Cotler further explained that Hartford's assertion that it would review the claim and provide a defense if appropriate was "disingenuous." (Id.) Finally, with regard to Hartford's statement that PBB's claims implicated fraud on the part of MP III, Cotler includes the one-sentence demand: "Provide us with the documents, witnesses, and testimony Hartford relies on for making such assertions immediately." (Id.) Cotler attached to his letter copies of the Rules of Professional Conduct and various cited judicial decisions.

Schiller responded, in turn, three days later, on May 7, 2009. The letter begins with Schiller's plea that Cotler "turn off the over-heated rhetoric" and expresses offense to Cotler's accusations of unprofessional conduct. "We have known each other for 25 years . . . ," Schiller states, ". . . [l]et's put it behind us." (Pl.'s Mot., Ex. 93, Doc. No. 69-7.)

Turning to the issues Cotler raised in his letter, Schiller states that he did not suspect that MP III would disagree on the plain language of the 2007 PBB Agreement, which Cotler drafted to settle and stay the PBB Action pending MP III's pursuit of the Leeds Weld claims. Schiller states that Hartford requested for Judge Bernstein to construe the release language in the declaratory judgment action, and such an avenue "is precisely the conduct that insureds are encouraged to pursue where there is a disagreement over contract language." (Id.) The letter continues:

> [N]ormally the "plain language" of the release is the best indication of the intent of the parties . . . . [a]nd the [PBB Agreement], including Section 8 titled "Mutual Release," indicates that MP III and PBB intended to release and dismiss all claims *except* to preserve the claims to distribute MP III's proceeds from its action against the Leeds Weld defendants. Since you lost that action at trial and on

appeal, there is not[h]ing to distribute and all other claims are released. That is what the agreement you drafted says. Moreover, it is what you said to Dan Layden of this office before the coverage litigation began, even conceding that it was only your associate's lack of precision in drafting that created the bare potential of a dispute over the release's construction. Regardless, Judge Bernstein will ultimately decide the intent from the agreement itself. To the extent that you take the position that Judge Bernstein has already interpreted the language, we disagree, as his ruling so far addresses at most only defense (not indemnity). We have set forth this discussion already in opposing MP III's motion for reconsideration in federal court and elsewhere, so you are aware of it.

(Id.)

In the next paragraph, Schiller states,

I cannot believe that you would even suggest that I would ever allow a witness, a client, or an insured to perjure itself . . . . To be perfectly clear, no one from The Hartford or this office asked or expected you to suborn perjury or misrepresent to anyone your or MP III's intent in entering into the [PBB Agreement]. If you and MP III's principals now contend that, despite its title and content, and your discussions with my colleague, it was not your or their intent to draft the PBB Release to, in fact, release claims between PBB and MP III and instead was only intended to serve only as a stand-still agreement, please say so in an affidavit, under oath, and we will not ask you to raise this as a defense in your upcoming mediation or arbitration with PBB . . . . To be clear, The Hartford does not believe this precludes it from using either the terms of the release of other evidence to disprove [the affidavit] . . . .

(Id.)

The letter concludes with Schiller's statement that, "The Hartford continues to reserve all rights available to it under the policies and at law, including . . . The Hartford's rights from the insured's lack of cooperation and the dereliction of counsel's duties in connection with this matter." (Id.)

Cotler responded on May 8, 2009. Cotler reiterated that the intent of the agreement with PBB was "to avoid having the jury in the Leeds Weld case hear the Bank's claims against PBB." (Pl.'s Mot., Ex. 94, Doc. No. 69-7.) Cotler adds that "[t]here is no language whatsoever that says the Bank released its claims, or that its recovery was limited to the Leeds Weld monies." (Id.) Cotler states that MP III will not assert the "release" defense, "because it is a lie." (Id.)

With regard to Schiller's <u>statement</u> that MP III not misrepresent itself in mediation or arbitration, Cotler states, "[y]ou are reversing your position when confronted with the Rules of Professional Conduct . . . ."  (<u>Id.</u>)  This reversal of position, "however, does not address your continued and Hartford's continued misconduct on this issue – which we will pursue to the fullest."  (<u>Id.</u>)  Cotler states that because Schiller and his colleagues, Daniel Laydon and Michael Carlson, have asserted the "release" position "knowing it was false and not the intent of the Agreement . . . [y]ou and your colleagues have already violated Rule 3.3."  (<u>Id.</u>)  Cotler then demands that Schiller, "confirm in writing by May 14, 2009 that you and Hartford are not asserting such a bogus 'release' defense any further in any legal proceeding, mediation or arbitration.  If not, you can explain your actions and court filings to the Disciplinary Board."  (<u>Id.</u>)

Cotler goes on, "I am compelled to add that you lie in documents other than pleadings as well. It is troubling."  (<u>Id.</u>)  The letter explains that, with regard to Hartford's position that it will review a claim and provide a defense if one implicates the polices, "[a]pparently you, Laydon, and Carlson forgot that you and Hartford sued the Insureds in state court seeking a ruling that Hartford <u>had no duty to defend Insureds against any of PBB's claims whatsoever</u> . . . . You forgot that Judge Bernstein rejected your effort not to provide a defense to Hartford's Insureds."  (<u>Id.</u>, emphasis in original.)  Cotler ends his letter by telling Schiller, "[y]our actions misrepresentations, and outright lies set forth in pleadings and in correspondence can also be addressed before the appropriate forum. We look forward to Hartford's response to our interrogatories served on you on April 30, 2009."  (<u>Id.</u>)

Schiller responded on May 13, 2009, with the final letter in the epic back-and-forth. Schiller stated, "I will not respond here to your personal attacks against my colleagues Dan Layden and Mike Carlson and against me . . . . I have asked you to put the attacks behind us . . . I hope you will move beyond them."  With regard to the Mediation with PBB scheduled for June 15, Schiller explained,

I appreciate that you have now twice stated in writing that the intention of MP III (and its lawyers) and PBB (and its lawyers) was not to release all claims between them or limit their dispute to the proceeds, if any from the Leeds Weld litigation but instead to enter into a tolling agreement and later mediate and/or arbitrate those claims. Although we disagree that this is what the release language provides, given these representations, The Hartford will not raise the PBB Release at the mediation or any subsequent arbitration as a bar to PBB's claims against MP III . . . .

(Pl.'s Mot., Ex. 95, Doc. No. 69-7.)

On June 15, 2009, PBB and MP III participated in a one-hour mediation culminating in a June 30, 2009 agreement between them which settled the claims for a payment of $200,000 from MP III to PBB. Hartford indemnified MP III for the $200,000 settlement amount and fully paid the defense fees and costs MP III incurred in connection with the mediation.

### J.        The Instant Complaint and Motions

On March 31, 2010, nine months after PBB and MP III mediated the claims, and just over a month after Judge Bernstein's February 19, 2010 order in the state court declaratory judgment action holding that the 2007 Release barred MP III's bad faith claim as to the alleged concealment of the umbrella policy, MP III filed a motion with the Third Circuit to withdraw its appeal of our ruling which had stayed its bad faith matter pending resolution of the declaratory judgment action ins state court.

On July 14, 2010, MP III filed an amended and supplemental complaint alleging a single count of statutory bad faith. (Doc. No. 46.) Hartford answered on August 13, 2010 (Doc. No. 47), and followed with a Motion for Protective Order to Stay Discovery on September 17, 2010. (Doc. No. 47.) On November 19, 2011, the parties filed cross motions for summary judgment. (Doc. No. 69—MP III; Doc. No. 70—Hartford). The parties filed their respective Responses on December 10, 2010, (Doc. No. 72—MP III, Doc. No. 71—Hartford), and Replies on December 30, 2010. (Doc. No 78—MP III; Doc. No 79—Hartford.) MP III filed a supplemental brief on January 19, 2011, (Doc. No. 83), to which Hartford responded on January 25, 2011 (Doc. No.

84). Hartford filed a supplemental brief on March 8, 2011, (Doc. No. 87), to which MP III responded on March 22, 2011 (Doc. No. 89). The parties' motions are now ripe for disposition.

## II.    LEGAL STANDARD

### A.    The Law on Summary Judgment

Under Federal Rule of Civil Procedure 56(a), we must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A fact is "material" for purposes of summary judgment if a dispute over that fact "might affect the outcome of the suit under the governing law." Id. at 248. A dispute as to a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. The dispute is not genuine if it simply involves "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Summary judgment is appropriate as a matter of law "when the non-moving party has failed to make an adequate showing on an essential element of his case, as to which he has the burden of proof at trial." Benjamin Post v. St. Paul Travelers Insurance Co., et al., 609 F. Supp 2d 382, 385 (E.D. Pa. 2009) (citing Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999)). To overcome a summary judgment motion, the non-moving party "must point to concrete evidence in the record," Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir.1995), mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."); Williams v. Borough of West Chester, 891

F.2d 458, 460 (3d Cir.1989) ("[A] non-moving party cannot simply reassert factually unsupported allegations.")  In determining whether summary judgment should be granted, "we must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  Stratechuck v. Bd. of Educ., South Orange–Maplewood Sch. Dist., 587 F.3d 597, 603 (3d Cir. 2009) (internal quotation marks and citations omitted).

> B.     The Law on Bad Faith

Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. Ann. § 8371, provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

Although the statute does not provide for a definition of bad faith, the definition as developed in Pennsylvania case law provides: " 'Bad Faith' on the part of insurer is any frivolous or unfounded *refusal to pay proceeds of policy* . . . ."  Simon Wrecking Co., Inc. v. AIU Ins. Co., 350 F. Supp.2d 624, 631 (E.D.Pa. 2004) (emphasis in original) (quoting Adamski v. Allstate Ins. Co., 738 A.2d 1033, 1036 (Pa. Super. Ct. 1999); citing Terletsky v. Prudential Property & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).  While it is an unfounded refusal to pay proceeds of policy that is at the heart of a bad faith claim, "at some point, the failure of the insurer to complete a claim investigation and/or provide coverage puts the insured on notice that the insurer has denied coverage" such that a claim for bad faith may exist.  Id. at n. 7. Accordingly, bad faith "need not be limited to the literal act of denying a claim," however, as the Third Circuit has held, "the *essence* of a bad faith claim must be the unreasonable and intentional (or reckless) denial of benefits."  UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d

497, 505 (3d Cir. 2004) (emphasis added).

The Third Circuit's statement in <u>UPMC Health System</u> that a bad faith claim must implicate the denial of benefits is framed by its previous opinion in <u>Polselli v. Nationwide Mut.</u> <u>Fire Ins. Co.</u>, 126 F.3d 524, 530 (3d Cir. 1997), where the Court observed that, under the plain language of the statute, a Section 8371 claim may not be the sole claim of an insured, rather, the bad faith claim must be based on an underlying action against the insurer. The statute provides that it applies "in an action arising under an insurance policy . . . . " 42 Pa. Cons. Stat. Ann. § 8371. "This language," the Court opined in <u>Polselli</u>, "implies that a determination of bad faith is merely an additional finding to be made in a predicate action to enforce some right under the insurance policy. Absent a predicate action to enforce some right under an insurance policy, an insured may not sue an insurer for bad faith in the abstract." 126 F.3d at 530. Of course, this does not impair the fact that a Section 8371 is its own independent cause of action. <u>Kauffman v.</u> <u>Aetna Caualty & Surety Co.</u>, 794 F. Supp. 137, 140 (E.D. Pa. 1992). It simply means that, "[a]t the very least, the predicate policy cause of action must be ripe before a Section 8371 cause of action may be recognized." <u>Polselli</u>, 126 F.3d at 530.

In assessing a bad faith claim brought under Section 8371, the Third Circuit has adopted a two-part approach initially articulated by the Pennsylvania Superior Court in <u>Terletsky</u>. <u>See</u> <u>Klinger v. State Farm Mut. Auto. Ins. Co.</u>, 115 F.3d 230, 233 (3d Cir. 1997) (citing <u>Terletsky</u>, 648 A.2d 680, 689-90 (Pa. Super. Ct. 1994)). Pursuant to this test, in order to recover under a claim of bad faith, the policy holder must show: "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." <u>Id.</u> The first prong of this standard, which focuses on the reasonableness of the insurer's conduct, requires an objective analysis. <u>See</u> <u>Williams v. Hartford Cas. Ins. Co.</u>, 83 F. Supp.2d 567, 574 (E.D. Pa. 2000), aff'd, 261 F.3d 495 (3d Cir. 2001). Therefore, as a matter of law, if *any* reasonable basis for the insurer's action existed, even if the insurer did not rely on that

reason, the insurer cannot have acted in bad faith under Section 8371. Id. As the Third Circuit

has stated, "[a] reasonable basis is all that is required to defeat a claim of bad faith." J.C. Penney

Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004).

Part two of the test requires a certain level of culpability on the part of the insurer–that is,

the insurer must have known of, or recklessly disregarded, its lack of a reasonable basis in

denying the claim. "Merely negligent conduct, however harmful to the interests of the insured, is

recognized by Pennsylvania courts to be categorically below the threshold required for a showing

of bad faith." Employers Mut. Cas. Co. v. Loos,  476 F. Supp.2d 478, 490 (W.D. Pa. 2007)

(citing Brown v. Progressive Ins. Co. & Mountain laurel Assurance Co., 860 A.2d 493, 501 (Pa.

Super. Ct. 2004).  Although there is no requirement that the insurer be motivated by "self interest

or ill-will," such a motive is probative to whether an insurer knowingly or recklessly disregarded

its lack of a reasonable basis for denying a claim and reflects upon whether a refusal to pay

benefits is frivolous or unfounded.  Id.; see also Greene v. United Servs. Auto. Ass'n, 936 A.2d

1178, 1189-91 (Pa. Super. Ct. 2007).

The plaintiff in an action under Section 8371 must meet is burden of proof by clear and

convincing evidence.  Pilosi,  393 F.3d at 367.  This standard requires that the plaintiff show

"that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction,

without hesitation, about whether or not the defendants acted in bad faith." Id. (internal citations

and quotation marks omitted).  Indeed, "the clear and convincing standard is a stringent one,

surpassed in the law only by proof beyond a reasonable doubt."  Collins v. Allstate Ins. Co., No.

CIV. A. 95-592, 1997 WL 700495, *6 (E.D. Pa. Oct. 31, 1997).   At the summary judgment

stage, "the plaintiff's burden in opposing a . . . motion is commensurately high in light of the

substantive evidentiary burden at trial."  Pilosi,  393 F.3d at 367 (internal citations and quotation

marks omitted).   "Bad faith cases are commonly decided at the summary judgment stage, with

the court determining, as a matter of law, that the insurer had a reasonable basis for its actions."

<u>Id</u>.

III.    DISCUSSION

In its motion, MP III alleges that Hartford acted in bad faith when it (1) allegedly terminated the defense of MP III against underlying claims brought by PBB, and sought declaratory judgment that it did not have a duty to defend MP III against those claims, (2) "threatened" to terminate the defense after the state court ordered it to defend if MP III did not assert an "unsupportable" argument in arbitration between MP III and PBB, and (3) represented to MP III that it was not necessarily terminating coverage, when it actually was. (Pl.'s Br. Supp. Mot. Summ. J., Doc. No. 69-2 at 1, 24 & 26.)  Hartford argues that there was no active claim to deny, none of its conduct constituted a denial of a claim which may trigger the bad faith statute in the first place, it paid the defense and the ultimate settlement amount and therefore MP III suffered no harm, and, in any event, its position and conduct with regard to its defense and indemnification obligations was reasonable, thus precluding a finding of bad faith.

Unlike the record in this case, which is abstruse and complex, the application of the law to the facts once they are laid out is relatively straightforward.  Upon review of the extensive interrelated factual aspects, we are simply not left with a clear conviction that any of Hartford's conduct was unreasonable.  Although we are also not left with a clear conviction that Hartford's conduct rose to the level of actual or constructive claim denial, or that MP III suffered any actionable harm,  instead of devoting lines of discussion to these grayer issues, we rest our conclusion in this case on the bottom-line black-and-white point that Hartford's coverage position, and the accordant way it conducted itself, was not unreasonable.  Therefore, we find there is no genuine issue of material fact in this case,[14] and MP III's bad faith claim fails as a

---

[14]The parties' only potentially genuine factual dispute involves MP III's contention that Hartford did not pay the invoice of March 18, 2008 containing the four line items "expressly and completely devoted" to MP III's defense against PBB.  Even if this fact were to be found in favor of MP III, however, it does not affect the outcome of the suit based on our conclusion that Hartford's coverage

matter of law on the first prong of the Terletsky test.  We deal with each of MP III's three contentions—that Hartford (1) terminated coverage in bad faith, (2) "threatened" to terminate the defense, and (3) misrepresented its position— in turn.  As we present our findings on the overall reasonableness of Hartford's position first, this section provides the bulk of our discussion.  We conclude our discussion by considering an independent-but-related basis for summary judgment against MP III—that is, its bad faith claim does not arise out of any demonstrably ripe predicate action as the Third Circuit and Pennsylvania Supreme Court require.

## A.      Hartford's Defense and Indemnity Position

Our determination that Hartford's position as to its defense and indemnity obligations was reasonable rests on two related conclusions.  First, as of the date of the 2006 PBB Agreement, it was not an unreasonable position for Hartford to take there was no active or pending claim between PBB and MP III—and therefore, at the time, there was nothing for it to defend.  Second, based on the reasonable interpretation that the PBB Agreement limited the scope of mediation/arbitration to dividing the money MP III received in its affirmative claims against Leeds Weld, combined with the fact that MP III lost those claims, it was not an unreasonable position that, by contract, there  were no claims left to defend in the future.  Accordingly, given the interplay between the posture of PBB's claims and the language of the PBB Agreement, we cannot say with clear conviction that Hartford's position on its defense and indemnity obligations  was unreasonable.

MP III argues otherwise.  "The bottom line," MP III asserts, "is that the October 2006 Agreement is irrelevant to the determination of the duty to defend."  (Pl.'s Resp. at 21.)  MP III repeats the statement multiple times in it briefs that the duty to defend turns on only two things—the policy language and the allegations in the complaint. (Pl.'s Resp. at 11-12).  If the

_____

position was reasonable.  Therefore, this is not a material fact precluding summary judgment.

allegations in the complaint fall within the policy's coverage, there is a duty to defend. Nothing else affects this consideration. MP III contends, therefore, that Hartford improperly and unreasonably considered the effect of the PBB Agreement on the duty to defend. According to MP III, "Hartford's 'reading' of the Agreement even if reasonable . . . is not a defense to bad faith." (Pl.'s Resp. at 21.) Rather, "Hartford's purported reliance on a contract that is not even relevant to its duty to defend is, in and of itself, unreasonable and warrants liability for bad faith." (Pl.'s Resp. at 21.) MP III states that "every Hartford employee, claims person, lawyer, and executive admitted [the PBB Agreement] was irrelevant to Hartford's duty to defend."[15] (Pl.'s Resp. at 17.)

Although MP III correctly articulates the point of law regarding the roles of the policy and the complaint in controlling when the duty to defend is triggered, its myopic application of that principle to the present circumstance only serves to support the reasonableness of Hartford's position. MP III's argument that Hartford could only look at two things in determining its duty to defend—the policy and the allegations in the complaint—begs the question: which complaint does it look to—the Fourth Amended Complaint that has been marked by the state court as "settled discontinued and ended?" How do we know that the claims in that complaint survive?

It is obvious and logical that external factors such as court rulings and agreements between the parties affecting the vitality and operability of the legal claims may be considered in

---

[15]This statement regarding the purported admission of "every" Hartford employee mischaracterizes the record. Contrary to MP III's assertions, a review of the record reveals that the Hartford representatives testified that the PBB Agreement could, and did, have an impact on the duty to defend through its effect on the status of the claims. (See, e.g., Freiman Dep. at 147: 4-10, Def.'s Resp. Ex. 61., Doc. No. 71-15 ("The litigation has been dismissed. By this agreement, the litigation between the parties is dismissed, the effect of this dismissal is all of the claims between MP III and PBB are done . . . The only thing left is who gets what part of any recovery from Leeds Weld.") (relevant page omitted from excerpts provided by Plaintiff in its Ex. C); id. 285: 17-21 ("Our view of that agreement is that . . . PBB . . . released its claims against MP III. If there are no claims which could potentially trigger the duty to provide indemnity, if those had been released, then there can't be a duty to defend.")

determining the endurance of a particular duty to defend.  Given the fact that, as of February 21, 2008, mediation or arbitration had not been demanded, it was *solely* the language of the PBB Agreement that could have kept those claims in play.  Indeed, without the ability to consider the effect of the PBB Agreement,  we could say with certainty that, as of October 2006 when the complaint was dismissed, and before arbitration had been demanded, there were no claims to defend and no duty on the part of Hartford.  Hence, MP III's proposition here actually supports the reasonableness of Hartford's position.

Despite MP III's vehement assertions that it was bad faith for Hartford to look to the PBB Agreement in considering its duty to defend, MP III itself paradoxically relies entirely on the Agreement throughout its motion, response, and correspondence with Hartford, in arguing that the claims were active, were not limited to the Leeds Weld monies, and that Hartford terminated its defense of these claims.[16]  Judge Bernstein also relied on the language of the PBB Agreement in his declaration that Hartford retained a defense obligation with respect to PBB's remaining claims.  MP III places great weight on Judge Bernstein's opinion, and, in its motion, quotes, in bold letters, Judge Bernstein's statement that Hartford's duty to defend and request for

---

[16]See Pl.'s Mot. at 8 ("The[] Agreement specified that the Bank's claims being moved from court to mediation or arbitration were the claims in the Bank's Fourth Amended Complaint, the same claims Hartford agreed to defend and had been defending since 2002. . . . Nothing in the October 2006 Agreement limited the Bank's recovery . . . . "); Pl.'s Mot. at 12  ("Schiller ignored: the critical qualification to the release at the very beginning of paragraph 8 . . . ; the language of the Agreement in the 'whereas' clause on the very first page which specified that the Bank's claims were being moved out of court and would be resolved in mediation or arbitration; the 'Whereas' clause on the first page which specified that the Bank's claims being moved to mediation/arbitration were the claims in the Banks' Fourth Amended Complaint . . . "); Cotler Voicemail, Pl.'s Mot., Ex. 64, Doc. No. 69-14 "( I am looking over the [PBB Agreement] again and I think there is a very good argument that the underlying claims still exist and that what [PBB] was agreeing to was only that the damages would be limited to what we got from Leeds Weld.  In fact, in the Whereas clause it talks about how [PBB] would bring [its] claims in arbitration and mediation first. . . ); Cotler Feb. 28 Letter, Pl.'s Mot., Ex. 86, Doc. No. 69-7 ( "the agreement with the Bank never specifically provides that the Bank's damages and recoveries are limited to 'Leeds Weld monies'. . . .  A fair reading of the agreement may be that the Bank only agreed to transfer all of its claims against MP III, Morse and Dalglish, for which there is insurance coverage, from the trial court to arbitration.")

declaratory relief "'hinges on the interpretation of unambiguous language" of the PBB Agreement. (Pl.'s Mot. at 18.) It would be rather incongruous of MP III to, on the one hand, rely so heavily on Judge Bernstein's opinion which grounded the duty to defend in the language of the agreement, and on the other, say that the agreement has no effect on the duty to defend.

Contrary to MP III's argument, Pennsylvania law is clear that the duty to defend may be affected by the settlement, dismissal, or discontinuation of an underlying action. MP III does correctly state the proposition that, in Pennsylvania, the duty to defend is "*triggered*, if at all, by the factual averments contained in the complaint itself. Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908 A.2d 888, 896 (Pa. 2006) (emphasis added). MP III does not, however, cite the Third Circuit's opinion that "the obligation to defend is determined solely by the allegations of the complaint *in the action*." Pacific Indem. Co. v. Linn, 766 F.2d 754, 760 (3d Cir. 1985) (emphasis added) (citing Wilson v. Maryland Casualty Co., 377 Pa. 588, 594 (Pa. 1954) (stating "the obligation of a causulaty insurance company to defend an action brought against the insured is to be determined solely by the allegations of the complaint in the action.)) Nor does MP III consider any of the Pennsylvania Superior Court or U.S. District Court for the Eastern District of Pennsylvania case law that directly discusses how long the duty endures, and when it ends. The Pennsylvania Superior court has held the duty continues "until the claim is narrowed to one patently outside the policy coverage . . . ." Step Plan Services, Inc. v. Koresko, 12 A.3d 401, 418 (Pa. Super. Ct. 2010) (internal citations an quotations omitted). The courts of this district have interpreted Pennsylvania case law to hold that the withdrawal or dismissal of a claim establishes that an insurer no longer has a duty to defend. See Dale Corp. v. Cumberland Mut. Fire Ins. Co., Civ. A. No. 09-1115, 2010 WL 2650604 at *12 (E.D. Pa. Jun. 30, 2010) (" withdrawal or dismissal of the claim . . . would clearly establish that [insurer] no longer had a duty to defend"); Meridian Mut. Ins. Co. v. James Gilligan Builders, Civ. A. No. 08-1995, 2009 WL 1704474, at *2 (E.D.Pa. Jun. 18, 2009) ("A duty to defend continues so long

as the complaint alleges a cause of action that potentially falls within the coverage provision of the insurance contract.  The obligation ceases, however, if the cause of action upon which the duty to defend exists is dismissed.") (citing <u>Bombar v. West Am. Ins. Co.</u>, 932 A.2d 78, 86- 87 (Pa. Super. Ct. 2007)).

In the present case, it is not an unreasonable argument that there are no claims to defend because the claims were not "in action" as the Third Circuit explicitly requires.  The claims in the underlying suit were extinguished by the state court's order marking them "settled, discontinued and ended."  Mediation and arbitration—which Hartford had reasonably concluded was based on a contingency— had not yet been demanded, thus it was reasonable to state that the claims  were not "in action," requiring a defense.  It was also not an unreasonable argument that the claims had been narrowed outside the policy coverage, because they had been, in fact, narrowed into non-existence.  Finally, the persuasive pronouncements of the courts of this district regarding the effect of dismissal are straightforward and directly applicable—the dismissal of a claim establishes that the insurer no longer has a duty to defend.  MP III argues otherwise, stating, "even if . . . the Bank's claims were released and gone *forever*, that had zero impact on Hartford's duty to defend."  (Pl.'s Resp. at 20, emphasis added.)   The case law, and simple logic, however do not support MP III contention.

Further basis for determining that Hartford's position as to its defense obligation was reasonable lies in the language of the Educators Legal Liability Policy itself.  Section VI of the Policy states, in relevant part:

> 4.  "Claim" means:
>     a. A *demand* received by an insured for "loss" alleging an "employment benefits wrongful act" or an "educational wrongful act" by any insured.
>
>     . . .
>
>     d. "Claim" includes any civil *proceeding* in which either "loss" is alleged or fact finding will take place, when either is the actual or alleged result of any "wrongful

34

act" to which the insurance applies. This includes:

> (1) An arbitration *proceeding* in which such loss is claims and to which the insured submits with our consent;

> (2) Any other alternative dispute resolution *proceeding* in which such "loss" is claimed and to which the insured submits with out consent; or

> (3) Any administrative *proceedings* established under applicable federal ,state or local laws as may be applicable to "employment practice wrongful acts" covered under this insurance

(ELL Policy, Def.'s Mot. Ex. 3, Doc. No. 12 at Page 9 of 11) (emphasis added)

A review of the definitions in the ELL Policy reveals that the policy equates a "claim" with a "demand" and a "proceeding." It is clear, however, that there was no proceeding at the time Hartford communicated its position. PBB's claims were dismissed from court in October of 2006, PBB did not demand arbitration from MP III on the balance due under the loan until April 6, 2009. Furthermore, if the relevant claim had existed prior to this date, as MP III proclaims, it would have been redundant for PBB to submit a subsequent demand, and for MP III to forward it to Hartford. The already existing "claims" should have done the trick.

The language used by MP III's counsel at the time of the events further suggests that the position that there were no pending claims was at least reasonable. In response to Schiller's February 21, 2008 letter, MP III communicated its own position that "there is a *very good argument* that the underlying claims still exist," (Cotler Voicemail, Pl.'s Mot., Ex. 64 (emphasis added)), that a *"fair reading* of the agreement *may be* that the Bank only agreed to transfer all of its claims . . . from the trial court to arbitration," (Cotler Feb. 28 Letter, Pl.'s Mot., Ex. 86 (emphasis added)), and "*if* the Pennsylvania Business Bank pursues any of its claims in arbitration or otherwise . . . we will expect the Hartford to pay for that defense and for any settlement or verdict or judgment."(Cotler Mar. 3 Letter, Pl.'s Mot., Ex. 11, Doc. No. 69-4 (emphasis added).) A review of the invoice Reed Smith submitted to Hartford shows counsel for MP III describing

his work as "relat[ed] to . . . defense against *later* claims by PBB." (Reed Smith Invoices, Pl.'s Mot., Ex. AA, Doc. No. 69-16.) The tone and substance of this language suggests it was at least not unreasonable for Hartford to assert there was no active or pending claim between PBB and MP III—and, therefore, at the time, there was nothing for Hartford to defend.

Similarly, it was also not an unreasonable position that, given the interplay between the language of the PBB Agreement and the outcome of MP III's affirmative claims against Leeds Weld, there could be no claims in the future. Based on counsel for MP III's own statement that the damages in mediation or arbitration would be limited to what MP III got from Leeds Weld, which appears twice in the record, combined with the fact that MP III lost its claim against Leeds Weld, it was not an unreasonable position that mediation or arbitration could not occur, and therefore Hartford had no duty to defend or indemnify MP III against PBB. While, in hindsight, this position may not have been correct, it was not unreasonable.

MP III's own counsel's statements provide the foundation for our conclusion that Hartford's position was reasonable. On February 25, 2008, in response to the February 21st Letter where Schiller initially stated Hartford's arguments with regard to its defense and indemnity obligations, Cotler left a voicemail with Schiller. MP III includes a transcript of the voicemail in the exhibits to his motion. Here, Cotler states, in relevant part:

> I just got back and I am looking over the [PBB Agreement] again and I think there is a very good argument that the underlying claims still exist and that what [PBB] was agreeing to was *only that the damages would be limited to what we got from Leeds Weld*. In fact, in the Whereas clause it talks about how [PBB] would bring [its] claims in arbitration and mediation first and that's why they are set forth in the Whereas clause . . .

(Cotler Voicemail, Pl.'s Mot., Ex. 64, Doc. No. 69-14 (excerpt) (emphasis added).)

Later in the parties' correspondence, on May 23, 2008, Cotler stated in a letter to Warren Freiman, "[PBB's] claims have not been extinguished. Rather, in a best case scenario, Pennsylvania Business Bank still possesses those claims *but its damages have a ceiling of any*

*monies that MP III receives [from Leeds Weld]*." (Pl.'s Mot., Ex. BB, Doc. No. 69-16 (emphasis added).)

Of course, in other places, including its briefings in the present action, MP III also asserts the position that "there is nothing in that agreement that specifically precludes the Bank from getting monies beyond the 'Leeds Weld proceeds' should the Bank prevail on its claims for which there is insurance coverage." (Cotler Feb. 28 Letter, Pl.'s Mot., Ex. 86, Doc. No. 69-7.) However, MP III is clearly inconsistent in its position here. MP III's own waffling, and its message in its twice-communicated position that the damages in mediation/arbitration, even in a "best case scenario," were limited to Leeds Weld monies, serve to demonstrate that this understanding was reasonable.

Counsel to MP III's statements verify that it was reasonable to interpret the PBB Agreement as contractually limiting the scope of arbitration to the appropriation of monies that MP III received as a result of its affirmative legal claims against Leeds Weld. MP III, however, lost its case against Leeds Weld. Therefore, it was reasonable to conclude that, by contract, arbitration would not, and could not, occur. Even with this as a reasonable basis for its position that there could be no claims to defend in the future, MP III made it abundantly clear that "[i]n the event the PBB brings a claim or attempts to resuscitate the released claim against MP III, The Hartford will review the claim properly in accordance with the policies of Pennsylvania law. If a duty of defense is owed, a defense will be provided. If such a hypothetical claim ultimately results in damages covered under the policy, the Hartford will cover those damages." (Schiller Mar. 4 Letter, Pl.'s Mot., Ex. 12, Doc. No. 69-4.)

In support of its position that Hartford unreasonably terminated coverage, MP III argues that, in the 2007 release executed by Hartford and MP III, which was entered into five months after the PBB Agreement, Hartford itself reaffirmed its continuing duty to defend PBB's claims against MP III. This is the same argument Cotler advances in his February 25, 2008 voicemail

where he says, "[y]ou guys in your [2007] settlement agreement with us agreed to defend the Bank's claims against us even after you had in your possession the agreement with Pennsylvania Business Bank. "  In actuality, however, by executing the 2007 Agreement, Hartford did not reaffirm any previously acknowledged duty—from the beginning, Hartford had been defending MPIII under a reservation of rights.  Accordingly, there was no previously acknowledged duty to reaffirm.  Furthermore, the 2007 Hartford Release expressly states that it "reflects a compromise of disputed claims and defenses and shall not be deemed or construed as an admission of liability. . . ." (Pl.'s Mot., Ex. 64, Doc. No. 69-6.)  Therefore, Hartford's entering into this agreement did not constitute an admission that the claims fell within the policy such that a defense was obligated, nor does it demonstrate that the February 21st Letter constituted an unreasonable change of position.

MP III correctly points out that Hartford did state that it would defend PBB's claims going forward pursuant to the agreement between the parties.  This agreement was indeed executed after Hartford had in its possession the prior agreement between PBB, dismissing their claims from court and agreeing to arbitrate or mediate.  However, in light of the conclusion that the present claims were not active and future claims were limited to the Leeds Weld monies, and given the emergence of the fact that the Leeds Weld case was unsuccessful, it was not unreasonable for Hartford to now assert the potential bases on which it felt its defense obligations, as previously agreed upon, had ceased.

Our final consideration in MP III's first set of allegations takes up its argument that Hartford's filing of its declaratory judgment action itself constituted bad faith.  Given our conclusion that Hartford's position as to its defense and indemnity obligations was not unreasonable, we can easily conclude that filing of declaratory judgment action was not unreasonable either.

A review of the complaints demonstrates that Hartford brought the declaratory judgment

actions to clarify the rights of the parties in light of the legitimately uncertain interplay between the Policies, the underlying litigation, the 2006 PBB Agreement, and the 2007 Hartford Release. The first paragraph of the initial declaratory judgment complaint suggests that it was geared primarily at obtaining a declaration with regard to MP III's demand that Hartford fund its appeal of its affirmative claims against Leeds Weld.  (See Def.'s Mot., Ex. 12, Doc. No. 70-21 at ¶1) ("The Hartford seeks a declaration of non-coverage from this Court in connection with the MP III Defendant's improper demand for the payment of legal fees and costs incurred in their affirmative pursuit of damages against third parties in underlying litigation originally brought by the Pennsylvania Business Bank." ).)  The rest of this complaint, and the subsequent complaint and amendment, expand the scope of the request beyond this limited purpose, however, and describe Hartford's position that the 2007 Hartford Release barred MP III's claims regarding the concealment of the umbrella policy, and that  PBB's claims were released by the PBB Agreement.

MP III argues that this conduct constitutes bad faith under § 8371.  We disagree.  The Pennsylvania courts have held that "[t]he Declaratory Judgments Act may be invoked to interpret the obligations of the parties under an insurance contract, including the question of whether an insurer has a duty to defend and/or a duty to indemnify a party making a claim under the policy." General Acc. Ins. Co. of America v. Allen,  692 A.2d 1089, 1095 (Pa. 1997).  Although the Pennsylvania courts have not gone so far, many jurisdictions explicitly *encourage* insurers in doubt about whether a duty to defend exists to seek declaratory relief.  See, e.g., Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.,  246 S.W.3d 42, 66 (Tex. 2008); Dorchester Mut. Fire Ins. Co. v. First Kostas Corp., Inc., 731 N.E.2d 569, 573 (Mass. App. Ct. 2000); Allstate Ins. Co. v. Carioto, 551 N.E.2d 382, 386 (Ill. App. 1 Dist. 1990); Jostens, Inc. v. Mission Ins. Co., 387 N.W.2d 161, 166–67 (Minn. 1986).  Several district courts within the Third Circuit have considered whether the filing of a declaratory judgment action constituted bad faith under § 8371 but none have found bad faith under the circumstances in the

respective cases.  See  Principal Life Ins. Co. v. DeRose, Civ. A. 08-2284, 2009 WL 4061366

(M.D. Pa. Nov. 23, 2009); Principal Life Ins. Co. v. Minder, Civ. A. No. 08-5899, 2009 WL

1917096 (E.D. Pa., Jul. 1 2009);  Victoria Ins. Co. v. Ren, Civ. A. No. 08-517, 2008 WL 2371850

(E.D. Pa.  Jun. 9, 2009); Employers Mut. Cas. Co. v. Loos, 476 F. Supp. 2d 478 (W.D. Pa. 2007).

Hartford cites the holdings of these cases to suggest that  the filing of declaratory judgment action

can *never* constitute bad faith.  (Def.'s Mot. Summ. J. at 25.)  Our discussion, however, need not

extend so far, because it is at least the case that when the basis for a declaratory judgment action is

not knowingly or recklessly unreasonable, there can be no bad faith.  In the present case, given the

uncertain interplay between the various agreements, the undetermined nature of the PBB claims,

MP III's demand that Hartford fund the appeal of the Leeds Weld claims, and MP III's impending

bad faith charges regarding Hartford's alleged concealment of the umbrella policy, the bases for

Hartford's declaratory judgment was at least reasonable.  Accordingly, we find that, as a matter of

law,  Hartford's filing of the declaratory judgment actions  was not in bad faith under Section

8371.

B.      The Hartford "Threats"

MP III's second stated bad faith allegation against MP III provides:

> Hartford and its lawyers improperly threatened the Insureds with the loss of a defense and
> indemnity for the Bank's claims – after the state court judge told Hartford it had to defend
> – if the Insured did not assert Hartford's release argument in defense of the Banks claims
> that the Insureds had repeatedly told Hartford was factually inaccurate.  Hartford's threats
> and demands constitute professionally unethical conduct, violated established case law,
> and is (sic) bad faith as a matter of law.

(Pl.'s Mot. Supp. Summ. J. at 26.)  Contrary to MP III's argument, however, the substance of

Hartford's communications in question, and the way it was delivered, was not unreasonable, and

therefore, not bad faith as a matter of law.

In early March, 2009,  Judge Bernstein declared that the PBB Agreement did not

extinguish Hartford's defense obligations.  Notably, Judge Bernstein did not opine as to the effect of the Agreement on Hartford's indemnity obligations.  On April 6, 2009, one month after Judge Bernstein opinion,  PBB demanded mediation against MP III for the first time.  In a letter of April 16, 2009, Schiller, on behalf of Hartford, confirmed that Hartford would be providing a defense, subject to a reservation of rights.  The statement that MP III characterizes as a "threat" and a "demand" came though Hartford's request that Cotler "please confirm that you intend to assert the defense of the release entered into between PBB and MP III to PBB's claims in any mediation and arbitration.  Also, when do you plan to assert this defense?"  (Def.'s Mot., Ex. 40, Doc. No. 70-50.)  Cotler responded by explaining that MP III and PBB did not intend to release their claims through the PBB Agreement, bold-font demanding that Hartford confirm in writing that it will "no longer demand [MP III] to testify falsely and assert . . . the factually and legally baseless [release] defense,"  and stating that Hartford's attorney's conduct violates the Pennsylvania Rules of Professional Conduct, which also obligate him to report Hartford's conduct to the disciplinary board. (Pl.'s Mot., Ex. 92,  Doc. No. 69-7.)  Schiller responded in turn by expressing dismay at Cotler's allegations of professional misconduct, further explaining Hartford's release argument, and conceding that if Cotler contends that  "it was not your or [PBB's] intent to draft the PBB Release to, in fact, release claims between PBB and MP III and instead was only intended to serve only as a stand-still agreement, please say so in an affidavit, under oath, and we will not ask you to raise this as a defense in your upcoming mediation or arbitration with PBB."  (Pl.'s Mot., Ex. 93,  Doc. No. 69-7.)   After Cotler reiterated his position on the "release" defense, and once more asserted his threat to report Schiller and his colleagues to the disciplinary board, Schiller replied,

> I appreciate that you have now twice stated in writing that the intention of MP III (and its lawyers) and PBB (and its lawyers) was not to release all claims between them or limit their dispute to the proceeds, if any from the Leeds Weld litigation but instead to enter into a tolling agreement and later mediate and/or arbitrate those claims. Although we disagree that this is what the release language provides, given these representations, The Hartford will not raise the PBB Release at the mediation or any subsequent arbitration as a bar to PBB's claims against MP III . . . .

(Pl.'s Mot., Ex. 95, Doc. No. 69-7.)

MP III contends that Hartford's actions here constituted bad faith. As a matter of law, however, they did not. At the threshold, the conduct clearly does not implicate the denial of benefits underpinning the "essence" of bad faith. UPMC Health System, 391 F.3d at 505. Had Hartford's actions truly been a threat—i.e., "raise this argument or else"— the denial of benefits or refusal to pay policy proceeds may have been implicated. However, here there was no "or else." Hartford never says or even implies that if MP III does not raise this argument, Hartford will not provide a defense. This essential element of MP III's allegation, therefore, is lacking. Furthermore, it was not unreasonable for Hartford to inquire or request confirmation that MP III would be asserting a reasonable argument in mediation. Judge Bernstein's opinion only held that the PBB Agreement did not extinguish Hartford's duty to defend. He did not opine as to whether or not the PBB Agreement limited the damages, and resultant indemnity obligations, to the Leeds Weld monies. It was not an unreasonable argument that the PBB Agreement did just that.

C.    Hartford's "Intentional Misrepresentation"

MP III's final basis for its bad faith claim alleges that Hartford "intentionally misrepresented" in letters and court filings that Schiller's February 21, 2008 letter did not terminate the defense against PBB's claims, when in actuality, it did. This, MP III claims, constitutes bad faith as a matter of law. Again, we disagree.

First, we fail to see how Schiller's February 21, 2008, letter constituted an "unequivocal termination," as MP III proclaims. A reading of the letter demonstrates that it had two purposes: (1) to state Hartford's position that it had no obligation to fund the appeal of MP III's affirmative claims against Leeds Weld, and (2) to advance its position that there was no active claim, and, based on the agreement releasing the claims and putting them into arbitration solely to "divvy up the [Leeds Weld] spoils," combined with the fact that it was clear there were no Leeds Weld spoils to divvy, there could be no claim. This letter was not an unequivocal termination of

coverage, rather, it is better characterized as a communication as to the potential bases for the denial of coverage, which does not constitute bad faith. See Simon Wrecking Co., Inc. v. AIU Ins. Co., 350 F. Supp. 2d 624, 632 (E.D. Pa. 2004) (holding that letter from insurer to insured that outlined "potential bases" for the denial of coverage and "did not actually deny coverage to [insured]" could not constitute bad faith).

In response to this letter, MP III communicated its own position that "there is a very good argument that the underlying claims still exist," (Cotler Voicemail, Pl.'s Mot., Ex. 64), that a "fair reading of the agreement may be that the Bank only agreed to transfer all of its claims . . . from the trial court to arbitration," (Cotler Feb. 28th Letter, Pl.'s Mot., Ex. 86), and "if the Pennsylvania Business Bank pursues any of its claims in arbitration or otherwise . . . we will expect the Hartford to pay for that defense and for any settlement or verdict or judgment."(Pl.'s Mot., Ex. 11, Doc. No. 69-4.)  The day after MP III asserted this position, and eleven days after Hartford's initial communication on the matter, Hartford told MP III that "in the event that PBB brings a claim or attempts to resuscitate the release claim against MP III, Hartford will review the claim promptly in accordance with the policies and Pennsylvania law.  If a duty of defense is owed, a defense will be provided." (March 4th letter, Pl.'s Mot., Ex. 12).  Hartford stated further, '[i]f such a hypothetical claim ultimately results in damages covered under the policy, then The Hartford will cover those damages." (Id.)  Hartford then reiterated its position that there was no active claim and that it did not agree that one could arise,. however it made clear that it "will . . . of course review any such claim that [MP III] should forward." (Id.)  Nothing in the March 4th Letter demonstrates any inconsistency in Hartford's stance.  The March 4th Letter reiterates Hartford's position that there is no active claim and that one cannot be brought, however, it confirms that if one is brought, a defense will be considered and provided if required.

MP III points to the reinsurance report Hartford filed with its own insurer as the "smoking gun," which demonstrates that Hartford, "lied to the Insureds about maybe defending them when

43

the bank demanded mediation.  Hartford had already decided it was not going to defend or indemnify the Insureds for the Bank's claims when the Bank pursued them."  (Pl.'s Br. Supp. Mot. Summ. J. at 33.)  We see the reinsurance report as being neither a confirmation of Hartford's prior refusal to pay proceeds, nor as a statement that was in any way inconsistent with its prior representations.  The report outlined the same argument Hartford had expressed to MP III in its February 21st and March 4th letters, and told its reinsurer that it, "believe[d] Hartford's contractual obligations have been eliminated by the parties' release."  Informing a reinsurer as to an argument for non-coverage and expressing a belief that the duty to defend or indemnify has ended are not tantamount to a denial of benefits.  Hartford could express its belief to its own insurer that it did not have an obligation and then, when pressed with an actual claim, provide a defense.  Nowhere does Hartford unequivocally state it would deny a claim if one was tendered. The argument Hartford described to its insurer was the identical argument it expressed in its letters.  The Reinsurance Report, like everything else MP III points to in this case, simply does not provide clear and convincing evidence of a denial of benefits, that Hartford misrepresented itself, or that it otherwise conducted itself in bad faith.

> D.  Bad Faith in a Vacuum

We conclude our discussion by considering the legal sufficiency of MP III's claim in light of the Third Circuit and Pennsylvania Supreme Court's holdings as to the "predicate cause of action" requirement in a bad faith claim under Section 8371.  A court within this district recently summarized the Third Circuit's position:

> The [Third Circuit in Polselli] stated that the statutory language of Section 8371 makes it clear that a bad faith claim cannot "exist in a vacuum" and instead provides "additional remedies upon a finding of bad faith made in a predicate action under an insurance policy."  126 F.3d at 530.  The Polselli court further stated that "at the very least . . . the predicate policy cause of action must be ripe before a Section 8371 cause of action may be recognized," indicating that a bad faith claim can be brought as long as a predicate policy cause of action is also brought.  Id.  (citing  Doylestown Elec. Supply Co. v. Md. Cas. Ins. Co., 942 F.

Supp. 1018, 1019-20 (E.D. Pa. 1996)).

Rohm and Haas Co. v. Utica Mut. Ins. Co., Civ. A No. 07-584, 2008 WL 2517176 at *2 n.3

(E.D. Pa. Jun. 23, 2008)

In Ash v. Continental Insurance Company, the Pennsylvania Supreme Court echoed the

earlier pronouncement of the Third Circuit. Quoting Section 8371, and expanding on the majority

pronouncement in Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 199 (Pa. 2007), the Ash Court

held that the bad faith statute "applies only in limited circumstances—i.e., where the insured first

has filed 'an action arising under an insurance policy' against his insurer. 932 A.2d 877, 882 (Pa.

2007).

Although the ultimate reasonableness of Hartford's position and conduct alone requires

summary judgment against Plaintiff, it is worth highlighting the fact that MP III's complaint lacks

a predicate action, rendering it insufficient under Third Circuit and Pennsylvania Supreme Court

precedent. In the present case, Plaintiff's complaint alleges only one count—bad faith. There

simply is no associated, attached, or concordant "action arising under an insurance policy." 42 Pa.

Cons. Stat. Ann. § 8371. In this case, the only conceivable ripe predicate action was Hartford's

declaratory judgment action filed in state court to determine whether it had an obligation to defend

MPIII from a claim PBB might raise in mediation. However, if the "essence" of a bad faith

claim is the denial of benefits, UPMC Health System, 391 F.3d at 505, it would make little sense

for a declaratory judgment action filed by an insurer, which, by its particular terms, is limited to

declarations regarding future conduct— i.e., the duty to defend in mediation if it is demanded—to

serve as the predicate basis for an insured's bad faith action. In the present circumstances, a claim

for breach of contract, be it actual or anticipatory, would theoretically have been the appropriate

predicate action.[17] Indeed, much of the dispute in the present motions centered on whether there

---

[17]We note that in MP III Holdings Inc., et al. v. The Hartford, Civ. A. No. 05-1589, 2006 WL
2645156 (E.D. Pa. 2006) (Shapiro, J.), MP III brought a breach of contract action for failure to defend

was a denial of a claim, or termination of coverage, at all.  MP III argued there was.  Implicit in MP III's argument that Hartford terminated coverage is a claim for breach of contract— such a claim was never raised.  Nothing in the Third Circuit or Pennsylvania Supreme Court's pronouncements, however, allow for an implied predicate action.  The Pennsylvania Supreme Court is clear—a bad faith statute applies only in the "limited circumstance[]" where the insured "first has *filed* 'an action arising under an insurance policy' against his insurer." <u>Ash</u>, 932 A.2d at 882 (emphasis added).  Although the Third Circuit held that "an insured may *list* the Section 8371 cause of action and the contract cause of action as separate counts in the same complaint," <u>Polselli</u>, 126 F.3d at 530, a review of the single-count bad faith complaint[18] (Doc. No. 46) reveals that never occurred in this case.  Instead, this case constitutes a claim of "bad faith in a vacuum" not actionable under the statute.

IV.    CONCLUSION

In accordance with the rulings above, summary judgment denying  MP III's motion (Doc. No. 69) and granting Hartford's (Doc. No. 70) will be entered.  An appropriate Order accompanies this Memorandum.

---

along with its bad faith claim.

[18]The court recognizes that MPIII's initial complaint, filed in 2008, included a claim for a declaration that "Hartford has a duty to defend plaintiffs in any mediation and/or arbitration proceeding related to the claims in the PBB litigation."  (Doc. 1 at ¶ 48.)   This request mirrors Hartford's prior declaratory claim in the state court requesting the same.  Our rationale that, if the "essence" of a bad faith claim is the denial of benefits, it would make little sense for a declaratory complaint regarding future conduct—i.e., the obligation to defend a claim in mediation or arbitration that has not occurred— to serve as the requisite predicate action, applies. Furthermore, it is clear that, in this case, the operative amended complaint (Doc. No. 46) contains no cause of action "under the insurance policy."